IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHARITA GAINES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16-cv-10940 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | Magistrate Judge Jeffrey T. Gilbert |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S L.R. 56.1(b)(3)(B) RESPONSE TO
DEFENDANTS' STATEMENT OF FACTS**

NOW COMES Plaintiff, SHARITA GAINES, by her attorneys, Barney &

Hourihane, LLP and Law Office of Timothy J. Fiscella, and, pursuant to Local

Rule 56 of the Federal Rules of Civil Procedure, responds to the Defendants'

Statement of Undisputed Facts as follows:

## Background

1. On November 29, 2016, Plaintiff SHARITA GAINES. (hereinafter
   "GAINES") filed a Section 1983 lawsuit against DEFENDANT OFFICERS
   and CHICAGO, alleging that the May 13, 2016 search of GAINES' residence
   was unconstitutional and that the Search Warrant was procured with
   materially false allegations and with information knowingly false, and that
   GAINES was unlawfully detained and falsely imprisoned, that
   DEFENDANT OFFICERS conspired to violated GAINES' constitutional
   rights, that they failed to intervene when others violated GAINES'
   constitutional rights and the City is responsible for these actions. (Doc 1)
   On June 12, 2018, GAINES filed her First Amended Complaint (Doc. 127)
   DEFENDANT OFFICERS and CHICAGO answered the complaint and
   amended complaint, denying all substantive allegations. (Docs. 103-138)

**RESPONSE**: Undisputed.

2. On May 13, 2016, Officer Peter Fleming, a Chicago Police Department Officer
   for 16 years assigned to Unit 189 Narcotics team under Sergeant John
   Hamilton, obtained a Search Warrant for "AK" at 7517 S. Coles Ave, 2B,
   Chicago Illinois, based on information from a concerned citizen whom Officer

Fleming had previously met five or six times and who informed him that both cocaine and heroin were being sold out of A.K.'s apartment where the citizen purchased drugs. (May 13, 2016 Search Warrant attached as Exhibit A; Officer Fleming Deposition attached under seal as Exhibit B, pp. 7, 9. 21, 22, 24; Deposition of Officer Betancourt attached under seal as Ex. C, pp. 22, 23, 35, 36, 39)

**RESPONSE**: Disputed. Plaintiff disputes that the individual identified above and in Officer Fleming's Complaint for Search Warrant as a "concerned citizen" provided Officer Fleming with the unit number where drug dealing was occurring. Officer Fleming's own supplemental police report drafted in May of 2016 states that the "concerned citizen" told him that drugs were being sold "from the second floor" at 7517 S. Coles Avenue. (Def. Ex. E–Supp. Report May 11, pg. 2). The report mentions nothing about the "concerned citizen" giving an exact unit number. (Def. Ex. E–Supp. Report May 11). Further, Officer Fleming stated in his deposition that he could not recall whether the concerned citizen gave him the exact address or just pointed out the building. (Def. Ex. B–Dep. Fleming, p. 25, lines 7-8). Officer Fleming could also not recall whether the concerned citizen ever actually went into a specific apartment. (Def. Ex. B–Dep. FLeming, p. 24, lines 26-18). Officer Betancourt similarly stated that he could not recall whether a unit number or letter was provided by the "concerned citizen." (Def. Ex. C.–Dep. Betancourt, pp. 35-36). ████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████. (Def. Ex. H–Dep. CI, p. 21, lines 1-22).

3.  This concerned citizen who provided the information to Officer Fleming did not receive any compensation for this information, other than a couple of cigarettes and was never signed up as a confidential informant (Ex. B, pp. 25-26, 28-29).

**RESPONSE**:  Disputed. Defendant provided the concerned citizen with cigarettes, which Plaintiff would characterize as compensation. (Def. Ex. B.–Dep. Fleming, pp. 25-26). In addition, Officer Fleming's supplementary reports state that he gave the CI $80.00 to make a "controlled buy" of narcotics on May 11, 2016 and $60.00 on May 12, 2016. (Def. Ex. E–Supp. Report May 11, p. 1; Def. Ex. F–Supp. Report May 12, p. 1). Those prices are the reported "purchase prices" for the transactions. (Def. Ex. E–Supp. Report May 11, p. 1; Def. Ex. F–Supp. Report May 12, p. 1). ████████████████████████████████ ████████████████████████████████████████████████████████. (Def. Ex. H–CI Dep., p. 40, lines 21-23, and p. 42, lines 7-12). A reasonable inference is that Officer Fleming allowed the CI to keep the surplus money left over after the buy. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (the Court must draw all justifiable inferences in the non-moving party's favor).

4.  According to Officer Betancourt, an officer assigned to the narcotics team of

the Chicago Police Department for 13 years, a concerned citizen is someone who is worried about illegal activities, regardless of their criminal status. (Ex. C, pp. 1, 6-7, 132).

**RESPONSE**: Undisputed. Plaintiff does not dispute this statement of fact to the extent that it only reflects to what Officer Betancourt believes the definition of a "concerned citizen" to be.

5. Based on this information, Officer Fleming and Officer Betancourt conducted surveillance from his covert vehicle, north of the building with GAINES' residence on Coles and 75th street (Ex. B., pp. 65, 71).

**RESPONSE**: Disputed. Plaintiff does not dispute that Officers Fleming and Betancourt performed surveillance on Plaintiff's building while on Coles Avenue north of Plaintiff's building. Plaintiff does dispute, however, that the surveillance was conducted based the information identified in Defendants' Statements of Fact, Nos. 2-4, in which Defendants claim they received information implicating Plaintiff's apartment in drug dealing. Plaintiff has denied that she was involved in drug dealing in anyway. (Pl. Ex. 1–Aff. Gaines). She has also denied that she allowed others to use her apartment for drug dealing. (Pl. Ex. 1–Aff. Gaines). No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). In addition, the locks to Gaines' apartment, Unit 2B, were changed before Gaines moved in. (Def. Ex. I– Dep. Allen, pp. 29-31). In addition, the information referred to by Defendants is that a "concerned citizen" implicated Plaintiff's apartment unit in drug dealing. Plaintiff disputes that. (See Response to Statement of Fact No. 2, incorporated herein by reference).

6. During their surveillance, Officer Fleming could not see the front door of GAINES apartment from his covert vehicle surveillance but were able to see foot traffic coming in and out from the front and back door, individuals who would walk up from different locations, walk to the residence, walking through the back gate of the building which was kept open, and be on the property for a short period of time and then walk away (Ex. B, pp. 68, 71, 73, 75, 76, 77).

**RESPONSE**: Disputed. Officer Fleming could not see any doors on the rear second floor landing and was not able to see the front door at all from his vantage point. (Def. Ex. B.–Dep. Fleming, p. 77, lines 9-15, p. 9-13); Pl. Ex. 2– Building Photos) The front door and back door referenced in the deposition testimony cited in this statement are actually the front gate and rear gate, rather than door to a particular apartment. (Def. Ex. B–Dep. Fleming, pp. 74-75). Officer Fleming would see people enter into the rear gate, and then go out of view, as his view was obstructed. (Def. Ex. B.–Dep. Fleming, p. 77, lines 9-15; Pl. Ex. 2–Building Photos).

7. After the individuals entered the gateway, they would be out of view because of obstructions so Officer Fleming could not seem any individual actually go inside the residence. (Ex. B, pp. 77, 80)

**RESPONSE**: Undisputed.

8. Based on this activity and investigation, Officer Fleming informed Sergeant Hamilton, a sergeant since 2001 who oversaw the narcotics team that included DEFENDANT OFFICERS, that he was going to take his Confidential Informant (herein after "C.I") to make a buy in an attempt to obtain a search warrant. (Deposition of Sergeant Hamilton attached as Exhibit G, pp. 7-8, 11-12).

**RESPONSE**: Disputed. The "activity and investigation" referenced in this Statement of Fact contains disputed facts. (See Plaintiff's Response to Statements of Fact 2–6).

9. The C.I. was previously used by Officer Fleming more than a dozen times over a few years because he found the C.I. to be reliable that has led to five positive search warrants and nothing from this search led Fleming to lose faith in the C.I as the C.I.. has never lied to him. (Ex. B, pp. 31, 34, 36, 48, 52, 62, 150, 151; Complaint For Search Warrant attached as Exhibit D, p. 2, previously attached as Exhibit 2 from Officer Fleming's Deposition).

**RESPONSE**: Undisputed.

10. The C.I. was not brought before the judge issuing the warrant because the C.I. was a registered confidential informant with organized crime and is provided financial compensation for positive search warrants. (Ex. B, p. 40, 52, 62; Ex. D)

**RESPONSE**: Undisputed.

11. The Search Warrant was based on the Complaint for the Search Warrant prepared by Officer Fleming after he conducted two controlled buys at 7517 S Coles Ave, Apartment 2 B with the assistance of Officer Betancourt and a Confidential Informant. (Ex. D; May 11, 2016 Controlled Buy attached as Exhibit E; May 12, 2018 Controlled Buy Attached as Exhibit F, previously marked as Exhibit 5 from Officer Fleming's Deposition)

**RESPONSE**: Disputed. Plaintiff disputes that the controlled buys were done at her apartment, Unit 2B. The evidence demonstrates that the drug dealing was occurring at Apartment 2A. Plaintiff has denied that she was involved in drug dealing in anyway. (Pl. Ex. 1–Aff. Gaines). She has also denied that she allowed others to use her apartment for drug dealing. (Pl. Ex. 1–Aff. Gaines). She also

4

testified at her deposition that, prior to the search warrant being executed on her residence, she reported a lot of traffic going in and out of her neighbor's apartment, Unit 2A. (Def. Ex. N–Dep. Gaines, pp. 28-31, 138-40). The building maintenance man, Parrish, also reported to building management in or around May of 2016 that the tenant in apartment 2A had a lot of traffic going in and out, which ultimately led to that tenant being evicted. (Def. Ex. I–Dep. Allen. pp. 18-21). The locks to Gaines' apartment were changed before Gaines moved in. (Def. Ex. I– Dep. Allen, pp. 29-31). No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). "AK" was the person who sold drugs to the CI and was the target of the search warrant. (Def. Ex. A–Search Warrant; Def. Ex. D–Complaint for Search Warrant). AK's real name is Llewain Hardin. (Pl. Ex. 4–Fleming Interrogatories, p. 5). In May of 2016, the leaseholder for Apartment 2A was Llewain Hardin. (Pl. Ex. 3–Lease 2A). Also, as testified to by the owner of the building, none of the rear doors to the apartment units at 7517 S. Coles Avenue had unit numbers displayed on them. (Pl. Ex. 5–Dep. Feldman, pp. 19-20). Gaines also testified at her deposition that her apartment unit does not have "2B" displayed on either the front or the back door. (Def. Ex. N–Gaines Dep., p. 137, lines 12-21).

12. Under sworn testimony, the C.I. had independent recollection of the buys in the summer of 2016 near 72nd and Coles and confirmed that Officer Fleming contacted the C.I. to assist him in a buy. (Deposition of the C.I. attached under seal as Exhibit H, pp. 11-12, 15-16).

**RESPONSE**: Undisputed.

13. Officer Fleming and Officer Betancourt picked up the C.I. in a covert vehicle and told the C.I. the location where the controlled buys would take place. (Ex. A, pp. 58-61; Ex. C, p. 43, 56, Ex. H, p. 17).

**RESPONSE**: Disputed. ████████████████████
████████████████████████████████████████
████████. (Def. Ex. H–CI Dep., p. 21, lines 1-22 ).

14. Officer Fleming and Betancourt drove the C.I. by the building where the controlled buy would take place and, after the briefing, the C.I. was dropped off and another drug purchaser pointed the C.I. to the location. (Ex. H, pp. 21-22).

**RESPONSE**: Undisputed.

15. At about 4:30 PM, the C.I. went to the building and rang the doorbell for Apartment 2B and a male from the window above told the C.I. to go around the back of the building to the second floor and the C.I. was buzzed in and

sold the C.I. and other people drugs on the back steps; While Betancourt and Fleming are watching the C.I. make the purchases the first and second time, they lost sight of her as she moved up the second level of the back stairs. (Ex. H, pp. 22- 23, 31, 33-34, 36, 37; Ex. C, pp. 64, 78).

**RESPONSE**: Disputed. Plaintiff disputes that any individual(s) involved in drug dealing were in Unit 2B or that the CI used the buzzer to the building. Initially, Gaines testified in her deposition that the buzzer to the building did not work in May of 2016. (Def. Ex. N–Dep. Gaines, p. 123, lines 12-19). Further, the evidence demonstrates that the drug dealing was occurring at Apartment 2A. Plaintiff has denied that she was involved in drug dealing in anyway. (Pl. Ex. 1–Aff. Gaines). She has also denied that she allowed others to use her apartment for drug dealing. (Pl. Ex. 1–Aff. Gaines). She also testified at her deposition that, prior to the search warrant being executed on her residence, she reported a lot of traffic going in and out of her neighbor's apartment, Unit 2A. (Def. Ex. N–Dep. Gaines, pp. 28-31, 138-40). The building maintenance man, Parrish, also reported to building management in or around May of 2016 that the tenant in apartment 2A had a lot of traffic going in and out, which ultimately led to that tenant being evicted. (Def. Ex. I–Dep. Allen. pp. 18-21). The locks to Gaines' apartment were changed before Gaines moved in. (Def. Ex. I– Dep. Allen, pp. 29-31). No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). "AK" was the person who sold drugs to the CI and was the target of the search warrant. (Def. Ex. A–Search Warrant; Def. Ex. D–Complaint for Search Warrant). AK's real name is Llewain Hardin. (Pl. Ex. 4–Fleming Interrogatories, p. 5). In May of 2016, the leaseholder for Apartment 2A was Llewain Hardin. (Pl. Ex. 3–Lease 2A). Also, as testified to by the owner of the building, none of the rear doors to the apartment units at 7517 S. Coles Avenue had unit numbers displayed on them. (Pl. Ex. 5–Dep. Feldman, pp. 19-20). Gaines also testified at her deposition that her apartment unit does not have "2B" displayed on either the front or the back door. (Def. Ex. N–Gaines Dep., p. 137, lines 12-21).

16. The buzzers on the exterior of the building list the apartment numbers for the building, including "2A" and "2B"; The C.I. told Officer Fleming after the first buy on May 11, 2016 that "2B" was on the back door. (Deposition of Shavon Allen attached Exhibit I, pp. 39-40, 41 ex. C; Ex. B, pp. 80, 82, 84, 152; Exhibit E).

**RESPONSE**: Disputed. Plaintiff does not dispute that the buzzers on the exterior of the building list the apartment numbers for the building, including "2A" and "2B." Plaintiff disputes that the CI told Officer Fleming after the first buy on May 11, 2016 that "2B" was on the back door. The evidence demonstrates that the drug dealing was occurring at Apartment 2A. Plaintiff has denied that she was involved in drug dealing in any way. (Pl. Ex. 1–Aff. Gaines). She has also denied that she allowed others to use her apartment for drug dealing. (Pl.

Ex. 1–Aff. Gaines). She also testified at her deposition that, prior to the search warrant being executed on her residence, she reported a lot of traffic going in and out of her neighbor's apartment, Unit 2A. (Def. Ex. N–Dep. Gaines, pp. 28-31, 138-40). The building maintenance man, Parrish, also reported to building management in or around May of 2016 that the tenant in apartment 2A had a lot of traffic going in and out, which ultimately led to that tenant being evicted. (Def. Ex. I–Dep. Allen. pp. 18-21). No one else had access to Gaines apartment other than Gaines and the maintenance man, Parrish. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen, pp. 29-31). The locks to Gaines' apartment were changed before Gaines moved in. (Def. Ex. I– Dep. Allen, pp. 29-31). No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). "AK" was the person who sold drugs to the CI and was the target of the search warrant. (Def. Ex. A–Search Warrant; Def. Ex. D–Complaint for Search Warrant). AK's real name is Llewain Hardin. (Pl. Ex. 4–Fleming Interrogatories, p. 5). In May of 2016, the leaseholder for Apartment 2A was Llewain Hardin. (Pl. Ex. 3–Lease 2A). Also, as testified to by the owner of the building, none of the rear doors to the apartment units at 7517 S. Coles Avenue had unit numbers displayed on them. (Pl. Ex. 5–Dep. Feldman, pp. 19-20). Gaines also testified at her deposition that her apartment unit does not have "2B" displayed on either the front or the back door. (Def. Ex. N–Gaines Dep., p. 137, lines 12-21).

17. The C.I. told Officer Fleming and Betancourt that the door where the drugs was sold from was the first door right in front of you when you go up the stairs to the second floor, with "2B" above the door head above the door frame in gold letter stickers. (Ex. H, pp. 32, 38, 48, 49, 54, 66; Ex. C, pp. 65, 68, 70, 74).

**RESPONSE**: Disputed. First, neither of Officer Fleming's supplemental reports detailing the CI's "controlled buys" say anything about the door where drugs were purchased being "in front of you when you go up the stairs to the second floor." (Def. Ex. E–Supp. Report May 11; Def. Ex. F–Supp. Report May 12). Second, neither report says the CI observed "gold" lettering or "stickers" or that the unit number was displayed "above the door head." (Def. Ex. E–Supp. Report May 11; Def. Ex. F–Supp. Report May 12). Rather, Officer Fleming stated in his Complaint for Search Warrant only that the CI told him the rear *door* had "2B" displayed on it. (Def. Ex. D–Complaint for Search Warrant). In addition, none of the apartments at 7517 S. Coles Avenue had unit numbers displayed on the rear door. (Pl. Ex. 5–Dep. Feldman, p. 20, lines 3-12). Gaines also testified at her deposition that her apartment unit does not have "2B" displayed on either the front or the back door. (Def. Ex. N–Gaines Dep., p. 137, lines 12-21). A photograph of the rear door taken by Sergeant Fleming during the search does not show "2B" displayed anywhere on it. (Pl. Ex. 5–Photo of Door). Moreover, as discussed above, the evidence overwhelmingly demonstrates that the drug dealing was occurring at Apartment 2A. Plaintiff has denied that she was

involved in drug dealing in anyway. (Pl. Ex. 1–Aff. Gaines). She has also denied that she allowed others to use her apartment for drug dealing. (Pl. Ex. 1–Aff. Gaines). She also testified at her deposition that, prior to the search warrant being executed on her residence, she reported a lot of traffic going in and out of her neighbor's apartment, Unit 2A. (Def. Ex. N–Dep. Gaines, pp. 28-31, 138-40). The building maintenance man, Parrish, also reported to building management in or around May of 2016 that the tenant in apartment 2A had a lot of traffic going in and out, which ultimately led to that tenant being evicted. (Def. Ex. I–Dep. Allen. pp. 18-21). The locks to Gaines' apartment were changed before Gaines moved in. (Def. Ex. I– Dep. Allen, pp. 29-31). No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). "AK" was the person who sold drugs to the CI and was the target of the search warrant. (Def. Ex. A–Search Warrant; Def. Ex. D–Complaint for Search Warrant). AK's real name is Llewain Hardin. (Pl. Ex. 4–Fleming Interrogatories, p. 5). In May of 2016, the leaseholder for Apartment 2A was Llewain Hardin. (Pl. Ex. 3–Lease 2A). Also, as testified to by the owner of the building, none of the rear doors to the apartment units at 7517 S. Coles Avenue had unit numbers displayed on them.

To the extent that Defendants rely on the deposition testimony of the CI for this Statement of Fact, the Court should nearly entirely disregard that testimony. The CI clearly lied under oath numerous times. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████. (Def. Ex. H–CI Dep., pp. 30-31). ████████████████████████████████████████ ██████████████████████████. (Def. Ex. H–CI Dep., pp. 30-31). ████ ████████████████████████. (Def. Ex. H–CI Dep., p. 39). This is contradicted by the building owner, Ron Feldman, who testified at his deposition that none of the units have a unit number displayed on their rear doors. (Pl. Ex. 5–Dep. Feldman, p. 20, lines 3-12). Feldman goes to the building two to three times per week. (Pl. Ex. 5–Dep. Feldman, p. 16).

18. After the first controlled buy, the drug dealer gave the C.I. his phone number so the C.I. could call him instead of just popping by next time; Officer Fleming did a second controlled buy with the C.I. because he wanted a confirmation buy to make sure the information provided by the C.I. was verified. (Ex. C, p. 133; Ex. H, p. 40).

**RESPONSE**: Undisputed.

19. The C.I. called the dealer, A.K. before the second controlled buy and was told to come back where the C.I. buzzed the C.I. into the building and the C.I.

again purchased drugs from the same location at 2B. The C.I. told Fleming after the second controlled buy on May 12, 2016 at 1:17 PM when an individual named "AK" went back into the residence marked "2B" with an unknown male that opened the gate for the C.I. (Ex. A, p. 84, 86, 87, Ex. F; Ex. H, p. 45-46. 49-50, 54).

**RESPONSE**: Disputed. Plaintiff does not dispute that the CI called AK before the second controlled buy and was told to come back. Plaintiff disputes that the CI went to Unit 2B or to a unit that had "2B" displayed on the rear door. (See Response to Statement of Fact No. 16 and 17, incorporated here by reference).

20. The drugs bought by the C.I. from the controlled buys were tested and shown to be drugs but the search warrant for GAINES was a negative search and the C.I. was not compensated as a result (Ex. B, pp. 54, 63; Ex. C, p. 66).

**RESPONSE**: Undisputed.

21. Having gone to the 7517 South Coles residence since, Fleming saw that above the vestibule, the door has an "A" to the West and a "B" to the East encrypted into the concrete, which can be seen without entering the building. (Ex. B, p. 153, Photo attached as Exhibit M previously attached as Exhibit 9 in Officer Fleming's deposition).

**RESPONSE**: Undisputed. Plaintiff notes that the vestibule referred to above is at the front entrance to the building and that Defendant Fleming did not make this observation until after the execution of the search warrant. (Def. Ex. B– Fleming Dep., p. 152-53).

## SEARCH

22. Prior to the search, On May 13, 2018, Officer Fleming gave the DEFENDANT OFFICERS a briefing on the search location by Officer Fleming, what the building looks like along with a photo to pass around, the approach for the search, the unit number, the target location of the door being directly in front of the stairs on the second floor landing, and the target name, "A.K.". (Ex. C, pp. 83-84; Ex G, pp. 21-22, 24-25, 27, 94-95; Deposition of Officer Marco DiFranco attached under seal as Exhibit J, p. 23; Deposition of Office Verlisher Syas attached as Exhibit K, pp. 22-23, 24, 25-26; May 13, 2016 Search Warrant Data Sheet attached as Exhibit L).

**RESPONSE**: Disputed. Plaintiff disputes that Officer Fleming told the other officers that the target door was directly in front of the stairs on the second floor. Initially, drugs were being sold from Apartment 2A, not Apartment 2B. (See Response to Statement of Fact No. 16 and 17, incorporated here by reference). In addition, Officer Fleming did not note in either of his supplemental reports

drafted after the "controlled buys" that the the door where drugs were being sold was directly in front of the stairs on the second floor, nor did he state that in his Complaint for Search Warrant. (Def. Ex. E–Supp. Report May 11; Def Ex. F–Supp. Report May 12; Def Ex. D–Complaint for Search Warrant). Also, Officer DiFranco did not testify that Officer Fleming said anything about the location of the target door being directly in front of the stairs. (Def. Ex. J– Dep. DiFranco, pp. 22-23;).

23. A.K was previously placed in custody by some members of the team in March, 2016, months before the search, but DEFENDANT OFFICERS did not know or remember his proper name because Officer Betancourt had to take him to the hospital after the arrest because he swallowed some narcotics. (Ex. C, pp. 10-11, 20-21; Ex. J, pp. 24, 25; Ex. K, pp.13-14).

**RESPONSE**: Disputed. Plaintiff disputes that none of the officers remembered "AK's" name. "AK" was arrested in March of 2016 as part of a narcotics investigation involving the following Defendants: Sergeant Hamilton, Officer DiFranco, Officer Betancourt, Officer Syas, and Officer Haidari. (Pl. Ex. 6–AK Arrest Report; Pl. Ex. 7–AK Supp. Report). The arrest was of particular note because "AK" swallowed a bag of drugs and had to be brought to the hospital and released without charging. (Pl. Ex. 6–AK Arrest Report; Pl. Ex. 7–AK Supp. Report).

24. After the briefing, DEFENDANT OFFICERS went to the area of 7500 South Coles in multiple vehicles and Sergeant Hamilton traveled in front to determine security issues for his team and decided that Officers Betancourt and Roman would climb a fence and unlock the back door to allow the rest of the team into the back gate after receiving a signal with a flashlight to let the remaining team members know Betancourt and Roman made entry. (Ex. B., pp. 101, 102, 103; Ex. C, p. 88, 101; Ex. G, pp. 27-28, 29; Ex. J, p. 29; Ex. K, pp. 31-32, 33).

**RESPONSE**: Undisputed.

25. DEFENDANT OFFICERS were wearing a raid jacket which says "Chicago Police" with the insignia and "Narcotics Division" and Officer DiFranco was wearing a baklava mask because he is an undercover buy officer who had purchased drugs on that block; at least two uniformed patrol officers were also present from the 4th District in a marked vehicle. (Ex. C, pp. 89, 90; Ex. G, pp. 16, 19, 44; Ex. J, pp. 30, 31, 38; Ex. K, p. 41).

**RESPONSE**: Disputed. Gaines testified that at least two officers were wearing masks. (Def. Ex. N–Dep. Gaines, p. 55, lines 2-3).

26. Officers Syas and Haidari went to the front of the building while the remaining officers, Sergeant Hamilton, Officer Fleming, Officer Roman,

Officer Betancourt, and Officer DiFranco went up through the rear. (Ex. J, p. 30; Ex. K, pp. 33-34).

**RESPONSE**: Undisputed.

27. At the front of the building, a man, later identified as Otis Green, was coming down the stairs with a ten dollar bill in his hand, in a hurry and opened the door for Officers Syas and Haidari, saying he was helping a lady with a baby bring in her groceries. (Ex. K, pp. 37, 38, 42, 48).

**RESPONSE**: Undisputed.

28. Officer Fleming was the first officer to arrive on the second floor landing and saw two doors, with one door facing Fleming, which is consistent with what the C.I has said about the two doors on the second floor, and the first door seen at the top of the stairs being the target residence but Officer Fleming does not recall a "2B' on the door on the night of the search. (Ex. B, p. 105, 107).

**RESPONSE**: Disputed. Plaintiff's disputes that the CI told Officer Fleming that she purchased drugs from the first door at the top of the stairs, or even that there were multiple doors on the landing. (See Responses to Statements of Fact Nos. 16, 17, and 22, incorporated here by reference).

29. Prior to the door being breached, Sergeant Hamilton recalls a "2B" in little gold decal squares upon entering the premises above the window in the center of the door but he was not 100% certain. (Ex. G, p. 82, 93)

**RESPONSE**: Disputed. Plaintiff does not dispute that Sergeant Hamilton testified to this in his deposition, but disputes that Sergeant Hamilton made any such observation, as it has been clearly established by the building owner and Gaines that unit numbers were not displayed on the back doors of the units. (See Responses to Statement of Facts Nos. 16, 17, and 22, incorporated here by reference).

30. On the day of the search, Officer Betancourt observed another door that faced east and did not match the description given by the C.I. (Ex. D, p. 133).

**RESPONSE**: Disputed. Plaintiff disputes this to the extent that the officers had any information that the door to Gaines' apartment, Unit 2B, was involved in the drug dealing. (See Responses to Statement of Facts Nos. 16, 17, 22, incorporated here by reference).

31. This information from the C.I. on which door leads to the residence drugs were purchased from is not in the narrative on either buys. (Ex. B, p. 105-106, Ex. E, Ex. F).

**RESPONSE**: Undisputed. In addition, that information was not in the Complaint for Search Warrant. (Def. Ex. D–Complaint for Search Warrant).

32. Officer Fleming knocked on the back door with his hand, announced "Chicago Police, Search Warrant" and waited for a response; he saw and heard a female inside from the top of the door where there is glass and asked her to open the door; she only said "no" multiple times. (Ex. B, pp. 110-111,112, 114; Ex. C, p. 104; Ex. J, p. 42).

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door call out the name of a male. (Def. Ex. N–Dep. Gaines, p. 50, lines 6-18). She also testified that she only responded, "Who?" (Def. Ex. N–Dep. Gaines, p. 50, lines 19-24). Gaines did not hear anyone tell her to open the door. (Def. Ex. N–Dep. Gaines pp. 91). Gaines only heard Defendant Officers identify themselves as the police after they broke down her door and entered her apartment. (Def. Ex. N–Dep. Gaines, p. 53-54).

33. Officer Betancourt, at the lower end of the staircase, was also able to hear a conversation between Fleming and an excited female voice from someone inside the apartment; Officer DiFranco, who has been with the Chicago Police Department for over 20 years, heard Officer Fleming announce his office and say a few times that they had a search warrant and communicate with someone behind the door but he could not hear what was said. (Ex. C, pp. 104, 105; Ex. J, pp. 8, 45).

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door call out the name of a male. (Def. Ex. N–Dep. Gaines, p. 50, lines 6-18). She also testified that she only responded, "Who?" (Def. Ex. N–Dep. Gaines, p. 50, lines 19-24). Gaines did not hear anyone tell her to open the door. (Def. Ex. N–Dep. Gaines pp. 91). Gaines only heard Defendant Officers identify themselves as the police after they broke down her door and entered her apartment. (Def. Ex. N–Dep. Gaines, p. 53-54).

34. Sergeant Hamilton, who was on a landing about halfway up the back entrance, does not recall hearing the knocking from the ground level, but he did hear Fleming very loudly say, "Police, search warrant, police search warrant, open the door, open the door." (Ex. G, pp. 30, 31, 32).

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door call out the name of a male. (Def. Ex. N–Dep. Gaines, p. 50, lines 6-18). She also testified that she only responded, "Who?" (Def. Ex. N–Dep. Gaines, p. 50, lines 19-24). Gaines did not hear anyone tell her to open the door. (Def. Ex. N–Dep. Gaines pp. 91). Gaines only heard Defendant Officers identify themselves as the police after they broke down her door and entered her apartment. (Def. Ex. N–Dep. Gaines, p. 53-54).

35.As Sergeant Hamilton was making his way up the stairs, he hears someone on the inside talking but he could not discern what was being said in response to Fleming saying "We're the police. We have a search warrant. Open the door. We're going to break the door. Now, open the door." (Ex. G, p. 33)

**RESPONSE**: Disputed.  Gaines testified that she only heard the people outside of her door ask for a name. (Dep. Gaines 50).  She also testified that she only said, "Who?" in response. (Dep. Gaines 50).  Gaines did not hear anyone tell her to open the door. (Dep. Gaines 90-91).  She only heard them ask like they were calling for somebody. (Dep. Gaines 90-91).  Gaines only heard them identify themselves as the police after they had busted into the apartment. (Dep. Gaines 53).

36.At that point, Sergeant Hamilton told Fleming to breach the door and that they would not negotiate through the door with someone while evidence could be destroyed or people could be running around. (Ex. G, p. 33-34)

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door ask for a name. (Dep. Gaines 50).  She also testified that she only said, "Who?" in response. (Dep. Gaines 50).  Gaines did not hear anyone tell her to open the door. (Dep. Gaines 90-91).  She only heard them ask like they were calling for somebody. (Dep. Gaines 90-91).  Gaines only heard them identify themselves as the police after they had busted into the apartment. (Dep. Gaines 53).

37.On May 13, 2016 at 8:32PM, Officer Fleming then told GAINES to step back while he used the Ram, a cylinder, heavy in weight to open the door which cracked the door to make a forced entry, called the Chicago ram.  (Ex. B, pp. 99, 114-115, 129, 133, 156; Ex. G, p. 34; Ex. J, p.  46).

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door ask for a name. (Dep. Gaines 50).  She also testified that she only said, "Who?" in response. (Dep. Gaines 50).  Gaines did not hear anyone tell her to open the door. (Dep. Gaines 90-91).  She only heard them ask like they were calling for somebody. (Dep. Gaines 90-91).  Gaines only heard them identify themselves as the police after they had busted into the apartment. (Dep. Gaines 53).

38.Because it is a metal shaped object with handles about 36 inches in length, similar in length to a rifle, people can confuse the Chicago Ram for a rifle or a bazooka. (Ex. B, p. 156; Ex. C, p. 135; Ex. J, p. 67).

**RESPONSE**: Undisputed to the extent that this Statement of Fact is a general proposition. Disputed as to whether Gaines confused a battering ram with a rifle. Gaines testified that she saw an assault style rifle in the hands of the person

13

who retrieved her daughter from the bedroom and who played with her daughter on the floor. (Def. Ex. N–Dep. Gaines, p. 93, lines 3-5, p. 114, lines 8-21, p. 138, lines 6-9). Officer Betancourt admitted that he is authorized to carry a rifle, that he has a rifle, and that he is the officer who retrieved Gaines' daughter from the bedroom and played with Gaines' daughter on the floor. (Def. Ex. C–Dep. Betancourt, p. 93-96, 116-19).

39. After the door was breached, Sergeant Hamilton learned that Fleming was talking to GAINES to step back, so she would not be hit with the door. (Ex. G, p. 34-35).

**RESPONSE**: Disputed. Gaines testified that she only heard the people outside of her door ask for a name. (Dep. Gaines 50). She also testified that she only said, "Who?" in response. (Dep. Gaines 50). Gaines did not hear anyone tell her to open the door. (Dep. Gaines 90-91). She only heard them ask like they were calling for somebody. (Dep. Gaines 90-91). Gaines only heard them identify themselves as the police after they had busted into the apartment. (Dep. Gaines 53).

40. Upon entry, the DEFENDANT OFFICERS saw GAINES was standing in the main room with her hands in the air in response to someone saying "Hands up". (Ex. G, p. 36).

**RESPONSE**: Disputed. Gaines testified that she initially ran from the area because she didn't know what was going on. (Def. Ex N–Dep. Gaines, p. 51, lines 9-24). She heard one of the officer yell, "Get the fuck on the floor" as they entered the apartment. (Def. Ex N–Dep. Gaines, p. 52, lines 10-12). She then got on the floor after hearing someone tell her to. (Def. Ex N–Dep. Gaines, p. 53, lines 2-4).

41. When Officer Betancourt entered the apartment, he had his gun drawn, pointed to the ground with his finger off the trigger because his follower officers were in front of him. (Ex. C, p. 113).

**RESPONSE**: Disputed. Gaines testified that there were initially three to four guns drawn on her when the officers, entered, including an assault-style rifle. (Def. Ex. N–Dep. Gaines, p. 93, lines 1-5, p. 100-01).

42. No other DEFENDANT OFFICERS on the narcotics team besides Betancourt can carry a rifle and none, including Betancourt were carrying assault rifles or long gun for this search and no such gun was ever on the floor with GAINES' baby; Officer Betancourt's long gun was in his personal safe on the day of the search. (Ex. C, pp. 98, 134-35; Ex. G, p. 44, 47, 57-8, Ex. J, p. 31; Ex. K, p. 62, 65).

**RESPONSE**: Disputed. Gaines testified that more than one officer was carrying an assault-style rifles. (Def. Ex. N–Dep. Gaines, p. 93, lines 1-5). Further, Gaines

testified that she saw an assault style rifle in the hands of the person who retrieved her daughter from the bedroom and who played with her daughter on the floor. (Def. Ex. N–Dep. Gaines, p. 93, lines 3-5, p. 114, lines 8-21, p. 138, lines 6-9). Officer Betancourt admitted that he is authorized to carry a rifle, that he has a rifle, and that he is the officer who retrieved Gaines' daughter from the bedroom and played with Gaines' daughter on the floor. (Def. Ex. C–Dep. Betancourt, p. 93-96, 116-19).

43. Officer Betancourt is trained to use and carry an assault rifle, or long gun, for search warrant, which may have armed persons, but only does so at the direction of Sergeant Hamilton when there is a need for one with armed targets or large dogs. (Ex. C, p. 94; Ex. G, p. 46, 47, 51; Ex. J, p. 32, 35; Ex. K, p. 62).

**RESPONSE**: Disputed. Plaintiff disputes this to the extent that Officer Betancourt only carries his rifle when there are armed targets or large dogs. Initially, Gaines testified that she saw an assault style rifle in the hands of the person who retrieved her daughter from the bedroom and who played with her daughter on the floor. (Def. Ex. N–Dep. Gaines, p. 93, lines 3-5, p. 114, lines 8-21, p. 138, lines 6-9). Officer Betancourt admitted that he is authorized to carry a rifle, that he has a rifle, and that he is the officer who retrieved Gaines' daughter from the bedroom and played with Gaines' daughter on the floor. (Def. Ex. C–Dep. Betancourt, p. 93-96, 116-19). Further, Defendant Fleming testified that he had no information regarding weapons being present at the target location—and, in fact, that the CI told him she did not see any weapons at the target location. (Def. Ex. B–Dep. Fleming, pp. 93-94). Officer Fleming briefed the other officers prior to executing the search warrant on whether or not weapons were present. (Def. Ex. B–Dep. Fleming, pp. 93).

44. Officer Betancourt made entrance with Officer Roman by jumping a fence so he could not bring his assault rifle because it would impede him from getting over the fence. (Ex. C, p. 101, 134; Ex. G, p. 47-48, 51).

**RESPONSE**: Disputed. Gaines disputes that Officer Betancourt did not have an assault-style rifle. Gaines testified that she saw an assault style rifle in the hands of the person who retrieved her daughter from the bedroom and who played with her daughter on the floor. (Def. Ex. N–Dep. Gaines, p. 93, lines 3-5, p. 114, lines 8-21, p. 138, lines 6-9). Officer Betancourt admitted that he is authorized to carry a rifle, that he has a rifle, and that he is the officer who retrieved Gaines' daughter from the bedroom and played with Gaines' daughter on the floor. (Def. Ex. C–Dep. Betancourt, p. 93-96, 116-19).

45. After enough areas of the house were searched for safety reasons, Fleming presented GAINES with a copy of the search warrant within minutes. (Ex. B, p. 120, 122, 124).

**RESPONSE**: Undisputed.

46. None of the DEFENDANT OFFICERS ever saw GAINES on the ground or on her stomach. (Ex. C, p. 128; Ex. G, p. 36).

**RESPONSE**: Disputed. Gaines stated that she was on the floor, half-naked, facedown with her arms out for five minutes (Def. Ex. N–Dep. Gaines, p. 133-34). Shavon Allen testified at her deposition that, during her phone call with Gaines and the police, Gaines told her that the police had her on the ground with their guns out. (Def. Ex. I–Dep. Allen, p. 44, lines 2-4).

47. GAINES was wearing a t-shirt and some type of dark or black yoga stretch shorts or pants. (Ex. B p. 121; Ex. C, p. 116-17; Ex. G, p. 37; Ex. J, p. 47-48; Ex. K, p. 58, 59).

**RESPONSE**: Disputed. Gaines testified that she did not have any bottoms on and was not wearing any underwear. (Def. Ex. N–Dep. Gaines, p. 54, lines 12-18, p. 129-130). Shavon Allen testified at her deposition that, during her phone call with Gaines and the police, Gaines told her that the police had her on the ground, on the floor in the apartment with their guns out, and that she was not dressed. (Def. Ex. I–Dep. Allen, p. 44, lines 2-4).

48. The property manager who was called by GAINES recalls that GAINES said she was wearing a T-shirt and maybe some underwear but was not naked. (Ex. I, p. 44).

**RESPONSE**: Disputed. Defendant mischaracterizes the testimony given by the property manager. Shavon Allen testified that Gaines and the police called her from Gaines' apartment during the search, and that she recalled Gaines telling her that she was "not dressed." (Def. Ex. I–Dep. Allen, pp. 43-44). When asked in her deposition to "interpret" what Gaines meant when she said she was "not dressed," Allen responded that she interpreted it to mean, "she probably had on maybe or something like that." (Def. Ex. I–Dep. Allen, p. 44, lines 11-15).

49. If GAINES was not wearing clothes, Sergeant Hamilton would have had her get dressed in the bathroom or Officer Syas would have been called in to get her some clothes. (Ex. C, p. 136; Ex. G, p. 79; Ex. K, p. 75).

**RESPONSE**: Disputed. Gaines testified that she did not have any bottoms on and was not wearing any underwear. (Def. Ex. N–Dep. Gaines, p. 54, lines 12-18, p. 129-130). Gaines testified that an officer eventually handed her a sheet to cover herself, and that later she her grabbed a pair of pants from a pile of clothes and put them on. (Def. Ex. N–Dep. Gaines, pp. 93-94).

50. After all the rooms were cleared with a protective search, Sergeant Hamilton went to GAINES because she was yelling about her baby being in another

room and ordered for an officer to bring the baby to GAINES. (Ex. G, pp. 38, 39).

**RESPONSE**: Undisputed.

51. Officer Betancourt went to the bedroom and observed the baby on an air mattress and relocated the baby to GAINES. (Ex. B p. 133; Ex. C, pp. 115-16; Ex. J; p. 48, 49; Plaintiff GAINES deposition attached as Exhibit N, p. 60).

**RESPONSE**: Undisputed.

52. GAINES was not handcuffed and was compliant and Sergeant Hamilton moved a cooler from the wall for GAINES to have a place to sit with her baby during the remainder of the search. (Ex. Hamilton, p. 40-41).

**RESPONSE**: Undisputed.

53. Sergeant Hamilton and Officer Betancourt were rolling a ball back and forth with the baby. (Ex. C, p. 118; Ex. G, p. 43, 57; Ex. J, p. 50; Ex. N, p. 114, 115)

**RESPONSE**: Undisputed.

54. GAINES told Sergeant Hamilton she does not know what happens when she goes to work during the day and suggested that somebody else must have keys to her apartment; she told Sergeant Hamilton that she had just gotten home and pointed to the groceries she brought in. (Ex. G, pp. 56-786).

**RESPONSE**: Disputed. No one other than Gaines and the maintenance man, Parrish, had keys to Plaintiff's apartment. (Def. Ex. N–Dep. Gaines, pp. 21, lines 16-18; Def. Ex. I– Dep. Allen p. 28, lines 11-14 and p. 31, lines 1-16). She also testified at her deposition that it never appeared to her that someone was using her apartment when she was not at home. (Def. Ex. N–Dep. Gaines, p. 43, lines 7-10).

55. Parrish, the building maintenance person at 7517 S Coles has keys to all the units in the apartments but the property manager did not believe that Parrish used his master key to access GAINES' property while she wasn't present but also could not rule it out (Ex. I, pp. 28, 31, 64).

**RESPONSE**: Undisputed.

56. Sergeant Hamilton had the conversation with the property manager and owner about making forced entry and having them come and assist in repairing the minor damage to the door; at that time Hamilton learned that there was previously a fire and that new locks were placed on the doors to GAINES unit. (Ex. B p. 133; Ex. G, pp. 52, 60-61; Ex. J, p. 53; Ex. I, pp.

44-45).

**RESPONSE**: Undisputed.

57. Half of the trim around the doorjamb was broken off during the breach so the refrigerator was moved in front of the door by Roman. (Ex. G, p. 61-62).

**RESPONSE**: Undisputed

58. When DEFENDANT OFFICERS left the premises, the door was locked and secured by Sergeant Hamilton, with a refrigerator also placed behind the door to help secure it a little better. (Ex. B, pp. 133-34, 135-36, 157, 158).

**RESPONSE**: Disputed. Plaintiff stated the police officers did not do anything to fix the door. (Def. Ex. N–Dep. Gaines, p. 72-73). She also stated that the door was left open and that it was left unsecured. (Def. Ex. N–Dep. Gaines, p. 74, lines 1-4).

59. The locking mechanism on the door was still working as was the deadbolt and fully secured because Sergeant Hamilton used the ram to hammer the nails back in so it was secure, but he wanted management to come out to secure it further with a new trim piece, which was a minor repair. (Ex. B p. 165, Ex. G, p. 62, 63-64, 75-76, photo of door mechanism previously attached to Officer Fleming's Deposition attached herein as Exhibit O).

**RESPONSE**: Disputed. Plaintiff stated the police officers did not do anything to fix the door. (Def. Ex. N–Dep. Gaines, p. 72-73). She also stated that the door was left open and that it was left unsecured. (Def. Ex. N–Dep. Gaines, p. 74, lines 1-4).

60. The door was *further* secured that night by Parrish the maintenance man and then replaced the next day or the day after that. (Ex I, p. 59).

**RESPONSE**: Disputed. Plaintiff stated the police officers did not do anything to fix the door. (Def. Ex. N–Dep. Gaines, p. 72-73). She also stated that the door was left open and that it was left unsecured. (Def. Ex. N–Dep. Gaines, p. 74, lines 1-4). A different maintenance man, June, came by to secure the door a day or two later. (Def. Ex. N–Dep. Gaines, p. 74, lines 1-9).

61. Sergeant Hamilton made the call as a courtesy to GAINES because she was afraid she would be kicked out of her apartment and no drugs or weapons were found during the search of GAINES' apartment. (Ex. B, p. 126-27, Ex. G, pp. 55-56, 64-65).

**RESPONSE**: Undisputed.

62. Officer Fleming doesn't normally have negative search warrants because he is pretty diligent in his investigations as in this case where he made two separate buys from the location, an initial buy and a confirmation buy the next day, when one buy would have been sufficient for a search warrant. (Ex. G, p. 69, 76, 77).

**RESPONSE**: Disputed. Officer Fleming could not recall how often he has had negative search warrants, but admitted he has had at least "a couple." (Def. Ex. B–Dep. Fleming, p. 55, lines 11-17). He could also not recall how many times that information from the CI in this case resulted in negative search warrants. (Def. Ex. B–Dep. Fleming, p. 52-53). Further, Plaintiff disputes that any controlled buys were done from her apartment, Unit 2B. (See Responses to Statements of Fact Nos. 16, 17, and 22, incorporated here by reference). Finally, Plaintiff disputes that Defendant is "pretty diligent" based on the facts of this case and notes that Defendants Fleming, Betancourt, Syas, and Roman were named as defendants in at least one other negative search warrant case involving similar allegations, *Williams v. City of Chicago, et al.*, No. 16-cv-2303. (Def. Ex. J–DiFranco Dep., p. 63-64).

63. The search itself lasted fifteen to twenty minutes, but DEFENDANT OFFICERS were on the promises for over thirty minutes during which time there was also an interview with a third party and discussions with the property manager to secure the door. (Ex. B, pp. 130-31, Ex. G, pp. 53, 64; Ex. K, p. 50).

**RESPONSE**: Undisputed.

64. Officer Fleming still believes that the correct residence was searched, based on the two controlled buys, the surveillance of people entering and exiting the residence at 7517 S. Coles, and that GAINES apartment is "2B" which was identified by the C.I; prior to the Search Warrant, Officer Fleming had no knowledge of GAINES. (Ex. B, pp. 13, 140, 142).

**RESPONSE**: Disputed. Plaintiff does not dispute that Officer Fleming still believes the "correct" residence was searched, but disputes the accuracy or truthfulness of the information that Officer Fleming appears to be relying on to support his "belief." (See Responses to Statements of Fact Nos. 16, 17, and 22, incorporated here by reference).

65. Drug dealers have changed the numbers on buildings or removed numbers to send the officers in the wrong direction. (Ex. C, p. 137).

**RESPONSE**: Undisputed.

66. Officer DiFranco, an undercover buy officer knows that the apartment building where the search warrant took place was "AK's spot" for drug sales.

(Ex. J, pp. 57, 60).

**RESPONSE**: Undisputed. Plaintiff does not dispute this Statement of Fact to the extent that Officer DiFranco heard that the apartment building was "A.K.'s spot" from "[p]eople out on the street." (Def. Ex. J–Dep. DiFranco, pp. 56-57). He did not hear anything about a particular floor or unit associated with A.K. (Def. Ex. J–DiFranco Dep., pp. 61-62).

67. In Officer DiFranco's experience as an undercover officer, drug dealers will use whatever is available to change up their ways of hiding or concealing their drugs from getting robbed by customers, other gang members or discovered by a search warrant, utilizing people, other tenants or janitors or a family member to assist them. (Ex. J, p. 66).

**RESPONSE**: Undisputed.

68. Sergeant Hamilton still has no doubt that drugs were purchased out of GAINES apartment, whether she has knowledge of it or not; Fleming believes there was "definitely narcotics activity going on in the residence and that that individual was not there at the time [DEFENDANT OFFICERS] executed the search warrant and possibly that Ms. GAINES could have had some type of knowledge that that was being conducted in her residence." (Ex. B p. 142; Ex. G, pp. 85, 97).

**RESPONSE**: Undisputed. Plaintiff does not dispute that this statement of fact reflects the beliefs of Sergeant Hamilton and Officer Fleming. Plaintiff disputes the accuracy of their beliefs. (See Responses to Statements of Fact Nos. 16, 17, and 22, incorporated here by reference).

69. GAINES was not free to leave until the investigation of the residence was completed but when Sergeant Hamilton told her she could leave, GAINES said she had nowhere to go. (Ex. B, p. 132; Ex. G, p. 54).

**RESPONSE**: Disputed. Plaintiff disputes this to the extent that Defendants are asserting that Gaines was free to leave after the search was completed. Despite the search ending approximately 15 minutes after the officers' arrival, they remained in her apartment, armed with firearms, for approximately 45 minutes to an hour. (Def. Ex. B–Dep. Fleming, p. 130-32; Def. Ex. N–Dep. Gaines, pp. 54-55, 93). Further, Officer Fleming testified that Gaines was not free to leave until the investigation into the residence was completed. (Def. Ex. B–Dep. Fleming, p. 132).

70. Sergeant Hamilton spoke to Otis Green who was found running away from the front of the house with $10 in his hand. He said he had helped a lady with groceries, which contradicted what GAINES said in not knowing who he was. (Ex. G, p. 83-84, 87; Ex N, p. 70).

**RESPONSE**: Disputed. Plaintiff disputes this statement of fact to the extent that Otis Green's statement contradicted Gaines in any way. Sergeant Hamilton testified that Green admitted that he was actually in the building to purchase drugs, *not* to help Gaines with her groceries. (Def. Ex. G–Dep. Hamilton, pp. 83-84). This same recitation of events is noted in the police report drafted by Officer Fleming. (Pl. Ex. 8–Search Supp. Report). Further, Gaines testified at her deposition that she heard Defendant Officers discussing that Green—who admitted he was there to purchase drugs—was there in relation to Apartment 2A. (Def. Ex. N–Dep. Gaines, pp. 69-70).

### Plaintiff's Testimony

71. On the days of the two buys in May, 2016, GAINES was working at her full time job at Neumann Family Services from 8am to 4pm, leaving her apartment at 7517 South Coles, Apartment 2B at 6:30 AM. (Ex. N, pp. 7, 16, 18).

**RESPONSE**: Disputed. Gaines testified only that, generally speaking, in May of 2016, she worked Monday through Friday from 8:00 a.m. to 4:00 p.m., leaving her apartment at 6:30 a.m. (Def. Ex. N–Dep. Gaines, pp. 16, 18).

72. Q: "Is it fair to say that during the hours that you were not at your house from 6:30 AM to 6:30pm during the week, you don't know who accessed your apartment?"
    A: "I couldn't be in two places at one time." (Ex. N, p. 42-43)

**RESPONSE**: Undisputed.

73. She never called the police but claims that she called the property manager numerous times because of disturbances and traffic next door to her on the second floor; she was never informed that there were drug activities in her apartment building but confirms that the maintenance guy Parrish had a key to her apartment at this time. (Ex. N, pp. 28-29, 30, 39, 40).

**RESPONSE**: Undisputed.

74. The property manager does not think Ms. GAINES ever called to complain about the foot traffic at unit 2A and said the first knowledge the property had of drugs being sold at 7517 South Coles was because of this incident and the drug dealing was associated with Unit 2A but she gets confused on the back entrance because the floor landings are not necessarily the same. (Ex. I, pp. 18, 19-20, 23-34, 38).

**RESPONSE**: Disputed. The property manager testified that she could not recall whether Gaines complained about the foot traffic, not that she did not think

Gaines complained. (Def. Ex. I–Dep. Allen, p.23-24).

75. While she was in the bathroom undressing after about 5 to 8 minutes of being home from getting home from work and buying groceries and walking them up alone, GAINES heard a knock at the back door; she states that she heard someone say they were looking for a name and after she asked "who" the she heard two big hits and the door popped open. (Ex. N, pp. 48, 49-51, 55, 92, 110).

**RESPONSE**: Undisputed.

76. After the second "kick" GAINES heard "get the fuck on the floor" and she was told they were the police so she followed the instructions (N, p. 52, 53).

**RESPONSE**: Undisputed.

77. GAINES was given a search warrant on the day of the search and DEFENDANT OFFICERS asked for "A.K" when GAINES asked what was going on. (Ex. N, pp. 44, 55).

**RESPONSE**: Undisputed.

78. GAINES states that she had a shirt on but no pants or underwear but DEFENDANT OFFICERS brought her a sheet or a piece of clothing from her apartment; at least three or four guns were drawn and two officers were wearing masks. (Ex. N, p. 54-55, 61).

**RESPONSE**: Undisputed.

79. According to GAINES, even after she was told not to move during the search, she tried to get up to use her phone; but none of the officers touched GAINES. (Ex. GAINES, pp. 57, 58).

**RESPONSE**: Undisputed.

80. Besides the door which repairs she did not pay for, nothing was broken or damaged during the search (Ex. N, p. 76-77, Photos attached as Exhibits 3 and 6 in GAINES' deposition attached herein as Exhibits O and P).

**RESPONSE**: Undisputed.

Respectfully submitted,

/s/ *Ian M. Barney*
BARNEY & HOURIHANE, LLP
847 Green Bay Road, Suite 320
Winnetka, IL 60093
Tel: (312) 854-0906
E: ian@barneyhourihane.com

/s/ *Timothy J. Fiscella*
LAW OFFICE OF TIMOTHY J. FISCELLA
201 E. Ogden, Suite 215
Hinsdale, IL 60521
Tel: (630) 708-6690
E: tjfiscella@tfiscellalaw.com

*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I, Ian M. Barney, hereby certify that on October 9, 2018, I electronically filed the foregoing **PLAINTIFF'S L.R. 56.1(b)(3)(B) RESPONSE TO DEFENDANTS' STATEMENT OF FACTS** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By:   <u>*/s/ Ian M. Barney*</u>
IAN M. BARNEY
Barney & Hourihane, LLP
874 Green Bay Road, Suite 320
Winnetka, IL 60093
Tel: (312) 854-0906
E: ian@barneyhourihane.com

Date: October 9, 2018